COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-433-CR

 

 

RANDY WILSON                                                                  APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM
CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I.  Introduction








Appellant
Randy Wilson appeals his conviction for murder. 
In four points, Wilson argues that the evidence is legally and factually
insufficient to sustain his conviction; that the trial court abused its
discretion by allowing the State to introduce photographs of the deceased=s body;
and that the trial court abused its discretion by allowing a witness to testify
that the victim had worked as a prostitute for Wilson prior to her murder.  We will affirm.

II.  Background

In the
early morning, August 19, 2007, two fishermen saw what they believed to be a
floating deer carcass in Lake Arlington. 
What they found was Brittany Rapoza=s
partially nude, heavily decomposed body. 
The fishermen called 9-1-1, and the Arlington Police Department
investigated.

After
the fishermen called 9-1-1, Officer Leonor Cerda arrived, and the fishermen
escorted him to the body.  Cerda said
that due to the bloated and decomposed condition of the body, which was laying
face down in the lake, it was initially difficult to determine whether the body
was male or female.  After retrieving the
body from the lake, officers were able to determine that the body was female.








Detective
Jim Ford also arrived at the lake that day. 
Ford testified that the body had no identifying marks and that no forms
of identification were found on the body. 
Ford again observed the body once it had been delivered to the medical
examiner.  The body had multiple stab
wounds.  Initially, Ford researched
missing persons databases but was unable make an identification.  Ford then issued a press release soliciting
information.  According to Ford, a
witnessCJenny
YeagerCcame
forward on October 8, 2007, with information regarding the body.  Yeager identified the body as being that of
Brittany Rapoza.  The next day, Yeager
escorted Ford to a location near where Rapoza=s body
was found.  There, in a storm drain, Ford
collected a portion of a burned shoe. 
Ford contacted the Tarrant County Medical Examiner=s Office
and requested that they conduct DNA testing on the shoe.

Yeager
also accompanied Ford to McCray ParkCa park
located on Lake Arlington near where Rapoza=s body
was found.  There, along a path and near
an embankment, Yeager pointed out Aan
orang[]ish-colored bathing suit strap.@  In addition to information pertaining to
Rapoza=s
murder, Yeager also provided Ford with additional names of witnessesCCyndi
Garcia, Laura Mallard, Delicia Traylor, and Joseph Grant.  Yeager even personally escorted Ford to Grant=s
residence.

Based on
information from Yeager, Garcia, and Mallard, Ford obtained arrest warrants for
Wilson and Grant.  Because Grant
cooperated, Ford did not arrest Grant; rather, Ford interviewed Grant
twice.  Grant provided further
information about Rapoza=s murder.








At
trial, Grant identified Wilson as the man he knew by the nickname, AC.@  Grant met Wilson at the house of Grant=s
sister, along with Garcia, Yeager, and Rapoza in August 2007.  Grant said that he, Wilson, Rapoza, Yeager,
and Garcia drove to Lake Arlington in the late evening of August 13, 2007.  When they arrived, Wilson and Rapoza got out
of the car and walked away by themselves. 
Roughly fifteen minutes later, Grant went to find them.  When he found them, Grant saw Wilson and
Rapoza fighting.  Grant testified that he
was going to break up the fight when he noticed that Wilson had a knife in his
hand.  Grant said that he witnessed
Wilson repeatedly stab Rapoza with the knife. 
According to Grant, Wilson then kicked Rapoza in the stomach and kicked
her over a small ledge and into the lake. 
Grant said that he attempted to Aget her
out [of] the lake@ and tried to push her up a
ledge.  Rapoza was trying to climb up the
ledge when Grant either let her go or dropped her because Wilson was walking
toward him.  Grant became scared and ran
back to the car.  Wilson eventually
returned to the car covered in blood, and the remaining four returned to the
house of Grant=s sister.  Grant testified that nothing was said among
the four about what had happened to Rapoza.

A couple
of days later, Grant said that he, Wilson, Yeager, Garcia, and his sister
returned to Lake Arlington.  The five
walked to the crime scene, which was now surrounded by yellow crime scene tape,
and Wilson Astarted kicking some dirt around
pointing [out] where [Rapoza=s] blood
was by [a] tree.@ 
Grant said he also saw Wilson throw a Aflip-flop@ into
the lake.  Grant said that after he went
back to the parking lot, Wilson returned with a beer can and a bloody cigarette
butt.








Yeager
testified that she met Wilson while living in an abandoned home in the spring
of 2007.  Yeager referred to Wilson as
her Aboyfriend.@  According to Yeager, she and Wilson moved in
together shortly after meeting, living with another of Wilson=s
girlfriends and her children.

Yeager
said that she and Wilson first met Rapoza in April or May 2007.  Yeager and Wilson had seen Rapoza walking
with Aseven to
ten guys@ along a
street where many homeless people tend to congregate.  Wilson asked Rapoza Aif she
needed a job, if she wanted to work for him.@  Yeager said that Wilson became Rapoza=s Apimp@ and
that Rapoza Awould be the prostitute and he
would provide her with protection . . . food and shelter and she
would go out and make the money.@  Wilson and the three women lived
together.  By Yeager=s
account, Wilson did not allow Rapoza to keep any of the money she earned
prostituting; rather, he would buy Rapoza alcohol, and Aif she
was lucky,@ he would buy her cigarettes.

Yeager
said that Wilson became displeased and violent with Rapoza because he thought
she Awasn=t making
enough money.@ 
According to Yeager, A[W]hen
[Rapoza] wouldn=t feel like going out, or when
she didn=t bring
the right amount of money back, you know, she would - - if - - it started out,
you know, pushing and slapping and shoving and strangling, and moved on to
. . . pretty brutal beatings.@








Yeager
testified that on the day Rapoza was killed, Rapoza called Wilson.  After the call, Wilson left in the early
evening to meet her.  Wilson returned
after Yeager had gone to sleep; but when she woke up, Yeager said that Wilson
had Ablood
all over his shoes [and] blood [spattered] all over his glasses.@  Yeager described Wilson=s shoes
as being Acompletely blood soaked,
completely.@ 
She said he also had blood on his clothing.  Yeager said that Wilson admitted to killing
Rapoza:

[H]e said he took her down to the lake, and he told her that - - that
she was going to get to [perform oral sex]. 
And so, when she started to take off her top, he told me that he stabbed
her in the heart, and that he stabbed her in the face and that he stabbed her
in the breasts, and he stabbed her in the butt, he stabbed her in her
vagina.  That=s what he told me.

 








The day
after the murder, Yeager accompanied Wilson to the scene of the crime to
retrieve Wilson=s cell phone, which he had left
there.  Yeager said that Wilson also
picked up Rapoza=s sunglasses, a beer can, and
some cigarette butts.  The couple returned
to the lake four to five days later along with Garcia and Grant.  Yeager said that the purpose of their return
to the lake was to Asee if there was any possible
evidence left.@ 
Similar to Grant=s account, Yeager testified that
they found one of Rapoza=s shoes but said that it was
Grant, not Wilson, who picked it up and threw it into the lake.  Yeager also witnessed Wilson attempt to
destroy his own bloody shoes.  According
to Yeager, Wilson poured gasoline on the shoes and set them on fire and then Akicked
them down into the drainage ditch@Cthe same
ditch where Ford collected a portion of a burned shoe.  Consistent with Ford=s
testimony, Yeager said that she went to the police on October 8, 2007, and told
them what she knew of Rapoza=s
murder.  She also said that she took
officers to the crime scene and to the location where she watched Wilson burn
his shoes.

Delicia
Traylor, an acquaintance of Yeager, testified that Wilson told her that he had Akilled
[a young girl] over a respect thing . . . because that=s how
much he loved [Yeager], and [that] it was at [Lake Arlington].@  On cross-examination, Traylor said that she
did not remember the specifics of her conversation with Wilson.  On redirect examination, Traylor clarified
that she told Ford that Wilson told her that he had dumped a body in Lake
Arlington.








Carolyn
Van Winkle, a DNA analyst for the Tarrant County Medical Examiner=s
Office, testified that she analyzed over thirty samples that Ford had submitted
for testing in October 2007.  Van Winkle
tested a pair of eyeglasses, a bikini strap, some seat covers from the car
driven to the lake by the party that included Wilson and Rapoza, and carpet
from the floorboard of the same vehicle. 
Van Winkle did not recover any DNA or blood evidence from these
items.  But Van Winkle did find blood
present on a burned shoe that was found in the drain where Yeager had taken
Ford.  Van Winkle also recovered a
partial DNA profile (four of fifteen markers) from the shoe.  Van Winkle compared the DNA recovered from
the shoe with DNA taken from Rapoza=s bodyCthe two
samples were a statistical match.

Dr. Gary
Sisler, a deputy medical examiner, performed the autopsy on Rapoza=s
body.  Sisler testified that he Afound
multiple stab wounds on the body@ that
were likely caused by a knife or bladed instrument.  He said that the stab wounds were the cause
of death given that approximately eleven of the stab wounds would have caused
excessive blood loss and would have been fatal. 
Sisler ruled Rapoza=s death
a homicide.  But due to the advanced
decomposition, Sisler was unable to determine a time of death.

The
State indicted Wilson for murder.  The
indictment included a repeat offender notice. 
Wilson pleaded not guilty to the charge of murder and true to the
enhancement paragraph.  A jury found
Wilson guilty and assessed punishment at life imprisonment.  This appeal followed.

III.  Sufficiency of the Evidence

In his
first and second points, Wilson argues that the evidence is legally and
factually insufficient to convict him of murder.  Specifically, Wilson contends that the State
failed to prove beyond a reasonable doubt that he committed the offense as set
out in the indictment.  We disagree.

 








A.     Law on Murder

A person
commits murder if he intentionally or knowingly causes the death of an
individual or intends to cause serious bodily injury and commits an act clearly
dangerous to human life that causes the death of an individual.  Tex. Penal Code Ann. ' 19.02(b)(1)B(2)
(Vernon 2003).  In its indictment, the
State charged that Wilson did Aintentionally
or knowingly cause the death of an individual, [Rapoza], by stabbing her with a
knife or a bladed instrument.@  Alternatively, the State charged that Wilson
did Aintentionally,
with the intent to cause serious bodily injury to [Rapoza], commit an act
clearly dangerous to human life, namely, stab [Rapoza] with a knife or a bladed
instrument, which caused@ her death.

B.     Legal Sufficiency Review

In
reviewing the legal sufficiency of the evidence to support a conviction, we
view all of the evidence in the light most favorable to the prosecution in
order to determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,
319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235 S.W.3d 772, 778
(Tex. Crim. App. 2007).








This
standard gives full play to the responsibility of the trier of fact to resolve
conflicts in the testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts. 
Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Clayton, 235
S.W.3d at 778.  The trier of fact is the
sole judge of the weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Brown v. State,
270 S.W.3d 564, 568 (Tex. Crim. App. 2008), cert. denied, 129 S. Ct.
2075 (2009).  Thus, when performing a
legal sufficiency review, we may not re-evaluate the weight and credibility of
the evidence and substitute our judgment for that of the factfinder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  Instead, we Adetermine
whether the necessary inferences are reasonable based upon the combined and
cumulative force of all the evidence when viewed in the light most favorable to
the verdict.@ 
Hooper v. State, 214 S.W.3d 9, 16B17 (Tex.
Crim. App. 2007).  We must presume that
the factfinder resolved any conflicting inferences in favor of the prosecution
and defer to that resolution.  Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778.

C.     Factual Sufficiency Review








When
reviewing the factual sufficiency of the evidence to support a conviction, we
view all the evidence in a neutral light, favoring neither party.  Neal v. State, 256 S.W.3d 264, 275
(Tex. Crim. App. 2008), cert. denied, 129 S. Ct. 1037 (2009);
Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006).  We then ask whether the evidence supporting
the conviction, although legally sufficient, is nevertheless so weak that the
factfinder=s determination is clearly wrong
and manifestly unjust or whether conflicting evidence so greatly outweighs the
evidence supporting the conviction that the factfinder=s
determination is manifestly unjust.  Lancon
v. State, 253 S.W.3d 699, 704B05 (Tex.
Crim. App. 2008); Watson, 204 S.W.3d at 414B15,
417.  To reverse under the second ground,
we must determine, with some objective basis in the record, that the great
weight and preponderance of all the evidence, though legally sufficient,
contradicts the verdict.  Watson,
204 S.W.3d at 417.








In
determining whether the evidence is factually insufficient to support a
conviction that is nevertheless supported by legally sufficient evidence, it is
not enough that this court Aharbor a
subjective level of reasonable doubt to overturn [the] conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s
resolution of a conflict in the evidence. 
Id.  We may not simply
substitute our judgment for the factfinder=s.  Johnson v. State, 23 S.W.3d 1, 12
(Tex. Crim. App. 2000); Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim.
App. 1997).  Unless the record clearly
reveals that a different result is appropriate, we must defer to the jury=s
determination of the weight to be given contradictory testimonial evidence
because resolution of the conflict Aoften
turns on an evaluation of credibility and demeanor, and those jurors were in
attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at 8.  Thus, unless we conclude that it is necessary
to correct manifest injustice, we must give due deference to the factfinder=s
determinations, Aparticularly those
determinations concerning the weight and credibility of the evidence.@  Id. at 9.  Our deference in this regard safeguards the
defendant=s right to a trial by jury.  Lancon, 253 S.W.3d at 704.  An opinion addressing factual sufficiency
must include a discussion of the most important and relevant evidence that
supports the appellant=s complaint on appeal.  Sims v. State, 99 S.W.3d 600, 603
(Tex. Crim. App. 2003).

D.     Legally and Factually Sufficient Evidence








Viewing
the evidence in the light most favorable to the verdict, the record
demonstrates that there was legally sufficient evidence that Wilson murdered
Rapoza.  In this case, there was an
eyewitness who testified that Wilson stabbed Rapoza multiple times and kicked
her body into the lake.  See Aguilar
v. State, 468 S.W.2d 75, 77 (Tex. Crim. App. 1971) (stating that a
conviction may be supported by testimony of only one eyewitness).  Wilson=s
girlfriend testified that he was wearing blood-soaked shoes, bloody clothing,
and glasses with blood spattered on them the morning after Rapoza was
killed.  The girlfriend also testified
that Wilson described having stabbed Rapoza multiple times.  She also took police to a location where a
burned shoe was found that had DNA consistent with Rapoza=s DNA on
it.  The girlfriend explained how Wilson
had poured gasoline on his blood-covered shoes and had set them on fire at the
location where the shoe was found.  See
Lee v. State, 866 S.W.2d 298, 302 (Tex. App.CFort
Worth 1993, pet. ref=d) (AIt is
consequently a well accepted principle that any conduct on the part of a person
accused of a crime subsequent to its commission, which indicates a >consciousness
of guilt= may be
received as a circumstance tending to prove that he committed the act with
which he is charged.@).  Another witness testified that Wilson had
admitted to killing a young lady at Lake Arlington.  And multiple witnesses testified that they
had accompanied Wilson back to Lake Arlington after Rapoza was murdered and
that Wilson had attempted to further conceal evidence of the crime.  See id.  The medical examiner testified that Rapoza
had been stabbed multiple times and that a number of the stab wounds would have
been fatal.








Viewing
the evidence in the light most favorable to the jury=s
verdict, we hold that a rational trier of fact could have found that the
evidence at trial was sufficient to establish the elements of murder, as
spelled out in the indictment, beyond a reasonable doubt.  See Jackson, 443 U.S. at 326, 99
S. Ct. at 2793; Clayton, 235 S.W.3d at 778; see also Tex.
Penal Code Ann. ' 19.02(b)(1)B(2)
(providing elements of murder).  Accordingly,
we hold that the evidence is legally sufficient to support Wilson=s
conviction.  We overrule Wilson=s first
point.

Furthermore,
we have reviewed the evidence in a neutral light, and we find no objective
basis in the record for holding that the jury=s
verdict was clearly wrong or manifestly unjust or that it was contradicted by
the great weight and preponderance of the evidence.  See Lancon, 253 S.W.3d at 704; Watson,
204 S.W.3d at 414B15, 417.  Rather, the evidence presented at trial was
sufficient to support the verdict and included the testimony of an eyewitness
that Wilson had stabbed Rapoza; a witness who saw Wilson in bloody clothing the
day after Rapoza=s murder; witnesses who
testified that Wilson had returned to conceal and destroy evidence; and
witnesses who testified that Wilson had admitted to killing Rapoza at the
location where her body was found. 
Additionally, no contrary evidence existsCand
Wilson points to none in the recordCthat would
render the evidence factually insufficient under the applicable standard of
review.  See Lancon, 253 S.W.3d at
704; Watson, 204 S.W.3d at 414B15,
417.  Accordingly, we hold that the
evidence is factually sufficient to support Wilson=s
conviction.  We overrule Wilson=s second
point.

 

 








IV.  Objected-to Photographs

In his
third point, Wilson argues that the trial court abused its discretion by
overruling his objection to the admission of photographs that the State
introduced depicting the condition of Rapoza=s body
as it was found in Lake Arlington. 
Specifically, Wilson argues that the Aphotographs
of the deceased did no more than to inflame the jury in sympathy for the State.@

Although
relevant, evidence may be excluded if its probative value is substantially
outweighed by the danger of unfair prejudice, confusion of the issues, or
misleading the jury, or by considerations of undue delay, or needless
presentation of cumulative evidence. 
Tex. R. Evid. 403.








Once a
rule 403 objection is made, the trial court must weigh the probative value of
the evidence to determine if it is substantially outweighed by its potential
for unfair prejudice.  Santellan v.
State, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997).  A rule 403 balancing test includes the
following factors:  (1) the inherent
probative force of the proffered item of evidence along with (2) the
proponent=s need for that evidence against
(3) any tendency of the evidence to suggest decision on an improper basis,
(4) any tendency of the evidence to confuse or distract the jury from the
main issues, (5) any tendency of the evidence to be given undue weight by
a jury that has not been equipped to evaluate the probative force of the
evidence, and (6) the likelihood that presentation of the evidence will
consume an inordinate amount of time or merely repeat evidence already
admitted.  Gigliobianco v. State,
210 S.W.3d 637, 641B42 & n.8 (Tex. Crim. App.
2006).

The
rules of evidence favor the admission of relevant evidence and carry a
presumption that relevant evidence is more probative than prejudicial.  Jones v. State, 944 S.W.2d 642, 652
(Tex. Crim. App. 1996), cert. denied, 522 U.S. 832 (1997).  When determining whether evidence is
admissible under rule 403, we do not consider just whether the evidence is more
prejudicial than probative, we consider whether the probative value is substantially
outweighed by the danger of unfair prejudice. 
Garcia v. State, 201 S.W.3d 695, 704 (Tex. Crim. App. 2006), cert.
denied, 549 U.S. 1224 (2007).  Our
highest criminal court has observed that we will reverse the trial court=s
judgment under rule 403 Ararely and only after a clear
abuse of discretion.@ 
Mozon v. State, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999).  And this is as it should beCit is
the trial judge, in the midst of the trial itself, who is in the best position
to weigh the probative versus prejudicial value of evidence on Themis=s scales
of justice.  See id.  As long as the trial court=s ruling
is within the zone of reasonable disagreement and is correct under any theory
of law applicable to the case, it must be upheld.  Winegarner v. State, 235 S.W.3d 787, 790
(Tex. Crim. App. 2007).








Wilson
complains about the admission of State=s
Exhibits 5 through 10.  State=s
Exhibit 5 demonstrates Rapoza as she was first seen by the fishermen.  State=s
Exhibit 6 shows the heels of Rapoza=s feet,
revealing severe decomposition and maggot infestation.  State=s
Exhibit 7 depicts one of Rapoza=s hands
in a decomposed state.  State=s
Exhibit 8 shows Rapoza=s
abdomen area and a sanitary napkin. 
State=s Exhibit 9 shows Rapoza=s
underwear.  State=s
Exhibit 10 depicts the front side of Rapoza=s
partially nude body.

Here,
all of the photographs were 5" X 7"; and the State concedes they were
in color at trial although our record contains black-and-white versions.  None of the photographs depicted a totally
nude body, although State=s Exhibit 10 shows Rapoza=s
partially decomposed breasts.  But State=s
Exhibits 9 and 10 were relevant to corroborate Cerda=s
testimony that it was initially difficult to determine if the body was male or
female.  State=s
Exhibits 6, 7, and 8 all show varying degrees of decomposition and maggot
infestation and also demonstrate what little identifying material was available
to the police.  This corroborated Ford=s
testimony that initial identification of the body was difficult.








These
six photographs, which Ford testified accurately depicted the crime scene, were
not exactly alike; were not unnecessarily duplicative; took almost no time to
introduce into evidence; and had very little, if any, potential to impress the
jury in an irrational but indelible way. 
The photographs were relevant to show the circumstances of the killing
and the crime scene at the time Rapoza=s body
was found.  Although the photographs of
Rapoza=s body
at the crime scene may be somewhat disturbing, their disturbing effect is due
to the circumstances of the crime rather than any particular images depicted in
the photographs.  The trial court=s ruling
that the probative value of State=s
Exhibits 5 through 10 outweighed any prejudicial effect was certainly
within the zone of reasonable disagreement. 
See Winegarner, 235 S.W.3d at 790.  Therefore, the trial court did not abuse its
discretion by overruling Wilson=s
objection and admitting these photographs into evidence.  We overrule Wilson=s third
point.

V.  Objected-to Testimony

In his
fourth point, Wilson alleges that the trial court abused its discretion by
admitting testimony about Rapoza=s having
worked for him as a prostitute over his relevance objections.  The State responds that the testimony was
relevant because it explained Rapoza and Wilson=s
relationship, demonstrated an escalating cycle of abuse by Wilson toward
Rapoza, and helped explain to the jury that Wilson Aloved to
be in control of other people and that he became violent when he felt he was
losing control over someone.@








Questions
of relevance are left largely to the trial court, relying on its own
observations and experience, and the trial court will not be reversed absent an
abuse of discretion.  Moreno v. State,
858 S.W.2d 453, 463 (Tex. Crim. App.), cert. denied, 510 U.S. 966
(1993).  Evidence is relevant if it has Aany
tendency to make the existence of any fact that is of consequence to the
determination of the action more probable or less probable than it would be
without the evidence.@ 
Tex. R. Evid. 401.  All relevant
evidence is admissible except as otherwise provided by constitutions, statutes,
or rules.  Tex. R. Evid. 402.

We first
note that Wilson does not now, nor did he at trial, voice a character evidence
objectionChis only objection is that
Yeager=s
testimony that Rapoza worked for him as a prostitute and that Wilson became
violent when she failed to earn sufficient amounts of money was
irrelevant.  Compare Tex. R.
Evid. 404(a) with Tex. R. Evid. 401.








Yeager
testified that Wilson initially recruited Rapoza to work for him as a
prostitute.  Yeager also testified that
Wilson maintained control of any monies Rapoza earned.  Yeager said that Wilson would become violent
if Rapoza failed to earn enough money or did not feel like prostituting
herself.  She even testified that the
cycle of violence evolved from Aslapping@ to the
point of Apretty brutal beatings.@  This testimony tended to show that Wilson was
violent toward Rapoza in the past and that his violence toward her was
escalating; therefore, the testimony was relevant to the charge of murder.  See Tex. Code Crim. Proc. Ann.
art. 38.36 (Vernon 2005) (AIn all
prosecutions for murder, the state . . . shall be permitted to offer
testimony as to all relevant facts and circumstances surrounding the killing
and the previous relationship existing between the accused and the
deceased . . . to show the condition of the mind of the accused
at the time of the offense.@).  Thus, the trial court did not abuse its
discretion by admitting Yeager=s
testimony regarding Rapoza=s having
worked for Wilson as a prostitute.  See
Reed v. State, 59 S.W.3d 278, 280 (Tex. App.CFort
Worth 2001, pet. ref=d) (AWe
review a trial court=s decision to admit or exclude
evidence under an abuse of discretion standard.@).  We overrule Wilson=s fourth
point.

VI.  Conclusion

Having
overruled each of Wilson=s four points, we affirm the
trial court=s judgment.

 

 

BILL MEIER

JUSTICE

 

PANEL:  LIVINGSTON, MCCOY, and
MEIER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  January 28, 2010











[1]See Tex. R. App. P. 47.4.